May it please the court, with me today are my co-counsel Jennifer Van Sant and Craig Schauer. We've asked to reserve five minutes for rebuttal. The first essential question posed by this case is this. In light of the decision of the United States Supreme Court in United Mine Workers v. Illinois State Farm, does the state's attempt to prohibit a non-profit association of employers from providing legal services to its members pass constitutional muster? That is the first essential question posed by this case. In United Mine Workers, the Supreme Court held that freedom of association guaranteed by the First and Fourteenth Amendments gave the union the constitutional right to provide legal services related to workplace issues to its members through licensed attorneys employed by the union. Our case is the same. We are a non-profit association. We wish to provide legal services related to workplace issues to our members through licensed attorneys employed by CAI. The only difference between this case and the United Mine Workers case is that we are an association of employers as opposed to employees. We believe the court's answer to this first essential question therefore should conclude this case in our favor. If not, then the questions of free speech, due process, vagueness, advertising, and monopoly follow. But again, the freedom of association question where the Supreme Court's guidance from the United Mine Workers case and the other associational freedom cases is, in our view, dispositive. We begin with five undisputed facts and a sixth one that the state bar and the members have joined together for the purpose of improving employer-employee relationships in the workplace. What about the fact that there's at least a commercial component to the work that your client does? That makes no difference under the constitutional analysis, Your Honor. Unions have membership from which they derive dues and revenues. In the Primus case, the court considered the fact that the ACLU might earn revenues by being involved in the case. The so-called commercial character, in our view, doesn't change it. But what matters is the expressive purpose of the organization. And that leads to my question. What expressive activity do you allege that CAI is engaged in? Our mission is to improve workplace relationships by counseling with our members on how to comply with the in lobbying efforts before the state and federal governments. Doesn't that take expressive, the concept of expressive activity, a little farther than we have recognized? I mean, don't we normally view expressive association as the right to associate for purposes of engaging in activities protected by the First Amendment? No, I don't think it's limited to that. In the United Mine Workers case, for example, the purpose of hiring the in-house attorney was to prosecute workers' compensation claims, simply workers' compensation claims. It was not to advocate for legislative reform or anything greater than that. And I think the freedom of association cases are clear that you don't have to have a grand purpose. I think the phrase from Button or one of the other cases is all purposes, great or small, are protected by the First Amendment. I was referring specifically to the Fourth Circuit's case in Patterson, Sigma CAI Fraternity v. Patterson, which speaks to associational activity, not just per se, but for the purpose of advancing a goal recognized by the First Amendment. And our goal is to advance compliance with the law and beneficial relationships for employers and employees. In other words, helping our members comply with the law and achieve the benefit of the protections of the law. And I think that is First Amendment expressive activity. One of the, I guess, one of the distinguishing features of these early Supreme Court cases was the notion that the groups that issue, for example, the NAACP, they were being effectively barred from meaningful court access. That's not the concern of your clients, certainly not its members, is it? It is. And there is also a distinction. It is a concern? It is a concern. Today, the labor and employment laws are incredibly complex, as Your Honor and the Court knows. Achieving compliance with those often requires the guidance and the help of an attorney. Well, there are plenty of lawyers in the private bar that are ready, willing, and able to help your corporate members comply with the law. Well, they're not on the same level or plane, I think, as the NAACP or these other entities that the Supreme Court was concerned about. Two points in response, if I may, Your Honor. One, in the United Mine Workers case, there was no suggestion, for example, that there were not other attorneys that were available. In the Brotherhood-Trayman case, there were other attorneys willing to accept FELA cases. In both cases, as the Supreme Court said, notwithstanding that, we recognize the right of the unions to hire attorneys to help those people. So the mere fact that there might be another way to obtain the aid is not enough to take away the right of association that we assert in this case. The second point is, as I said, labor laws today are very complex and very important to people. The rights are very important to the people. But for a small business— And those are First Amendment rights? Because that's really—that's the crux of your—that would have to be the crux of your argument. Well, First Amendment rights, meaning how to comply with law, how to express—I think comply with the state of the law is an expressive purpose. Is it a political purpose? No. Isn't it more of a regulatory compliance purpose? That's certainly part of it. But again, Your Honor, what the association as a whole does is look at the legislative effect and impact and advocates. We do have, as I have pointed out, we do have political activities that are important to the association. We lobby with the federal government and at the state government level. Then is that the basis for the program at issue here? Well, I don't think that—I think that what the proposed program at issue is, is to counsel members about their legal rights with respect to employment issues, including how to protect an employer and an employee's First Amendment rights. If somebody says, you can't do this because it violates my First Amendment rights, we would give counsel on that issue as it relates to the workplace. Sure. The basic concern that I have here is that I think the crux of your argument is that there appears to be a protectionist element to the regulation, but rational basis review is just not demanding. Well, certainly rational basis review is the most difficult standard for us, and we don't think we need to go there because of the associational rights question. But yes, that is the most difficult standard for us. Yes, rational review is a very favorable standard for the government. But we do believe, and we think the record evidence shows, that there is a protectionist element to the statute. That's why we brought the monopoly claim, among other things. What the effect of the statute is, Your Honor, is to force our members, when they want legal advice, to go to the private bar, as opposed to speaking to a licensed attorney on our staff who could easily counsel them and give them that information, and are deemed competent by the state bar to provide that. And that's so important because— —that the other side is going to argue satisfies the rational basis. And I understand that. I understand the argument that they make about that. But, Your Honor, you have to look at what the legislation does in this environment and this day and time. Again, and going back to Judge Diaz's question, it is not a satisfactory alternative for a small employer to be told that they have to stop the conversation with a CAI attorney and call somebody at the private bar, start all over again, and be given a charge for that service that they, in many cases, simply can't afford. There is a real crisis about providing legal services to very small employers, in particular. That's a real thing. And it's something that this proposal of ours addresses in a way that we say the Supreme Court has endorsed in the United Mine Workers case and the other association freedom cases. Mr. Phillips, under your view of things, are there any limits that the bar could place on the ability of organizations like yours, your clients, to practice law? Absolutely. They could have a registration requirement for trade associations that want to provide this, so that they would know where attorneys are providing these kinds of services. They could say that there has to be a supervisor appointed who is a lawyer and is the conduit between the lawyers giving the advice day to day and the management of the organization. Yes, there are ways that the state, in a less intrusive way, could come to some regulation that would satisfy any needs. Well, that sounds like a vehicle for regulating the activity. I was thinking more of any limits on simply a bar on organizations. I don't know, AARP, for example. What if they decided that they wanted to provide this kind of a service for its individual members? Under your theory, they couldn't be prevented from doing that? We think that the service has to match the expressive purpose, and that is the limitation. And articulate that as a limitation, because that does seem potentially quite expensive. I agree, and I think that the case law certainly does that or implies that. We don't think, and we're not asking this court to say, ours is an as-applied challenge. We're saying it shouldn't be enforced as against us for the program that we propose. Right. So we're not asking the court to write a bond on that. Judge Diaz's question goes, how far would that application extend? What's the logical limit? Expressive non-profit associations who are providing services, legal services, to their members consistent with that purpose. It's got to match the mission. And I think that's the touchstone or the key there. We think that the freedom of association question, as we said, is dispositive of this case. It is not necessary to reach the speech question, but if we go to the speech question, we think there that it is clear that what the state has done is prohibited speech between licensed attorneys and the members of the association. We think they have not shown any compelling interest of the state that requires that they do that. And if they have, they have not shown that it cannot be accomplished through a less intrusive means. We point out in the brief. That suggests that the compelling interest is the appropriate standard? We think strict scrutiny is the appropriate standard. We think that we also qualify and satisfy intermediate scrutiny. So we think under either standard, we should be allowed and are allowed by the First Amendment to do what we propose to do in this case. Either standard. Somewhat like in Becerra, where the case struggled with whether it should be strict scrutiny or intermediate scrutiny, and concluded that it didn't matter because the regulation there couldn't pass muster either way. We say the same thing in this case. To wrap up, there is a real and genuine need that our members have for the services that we seek to provide. There is not an adequate substitute or alternative, but the freedom of association cases don't require that there be such. But even so, there is not. There is this gap between the need for services and the ability of our members to get those services in an affordable way. And in the time they need it. The other aspect of it is, our members who are familiar with CAI and know what they can provide, want to be able to call and get the answer without delay and without starting over with a member of the private bar. And we think that's an interest that is just as important and of equal worth to the one in United Mine Workers. My time is up. Thank you, Mr. Phillips. Excuse me, Mr. Duncan. Thank you, Your Honor. Along with my colleague, Steve Russell, and Solicitor General of North Carolina, Matt Sawcheck, we're here on behalf of the defendants and intervener defendants in this case. I'd like to start, because I think it matters, to have some discussion about what the basis of the rule of regulation is in this case. This case is about the corporate practice of law, which is when a corporation, through an attorney-employee, seeks to represent a third party. North Carolina has had a strong public policy favoring personal representation, as opposed to representation by a corporation. It's been articulated in both the Gardner and Sewell Supreme Court cases and reaffirmed. Historically, the challenge of prohibition on corporate practice is not new. It was first enacted by the General Assembly in 1931. It's upheld by the Supreme Court twice since then, as I indicated. This is not a case where the regulatory regime has changed in order to target disfavored speech or some disfavored group. The law has remained the same. But the law has also made exceptions, particularly for certain nonprofit entities providing legal services in a narrow realm. And it appears to have been implemented without much incident. So why can't the same be done here? The exceptions have been, as you said, Your Honor, limited in nature. And to run through those, the first one would be, a corporation can hire an attorney to represent that corporation. That is a corporate employee who can represent the corporation. And we are all well aware of the many attorneys who fill that role. There has also been exceptions made for legal aid services, that they can be employed ultimately by an employer who may or may not be a lawyer. It's the administrator. They're supervised by lawyers, and they provide public service that cannot otherwise be obtained for affordable services and access to the courts. Isn't that exactly the argument here? I don't think it is, Your Honor. Well, the argument is that these are small businesses who like legal aid. Individuals who avail themselves of legal services are unable to otherwise afford legal services. And so they come to a nonprofit entity that makes those services available. I do not believe the record in this case supports that, Your Honor, with respect to CAI. They have raised the affordability of counsel issue, but the record evidence shows that no such issues are present. The member testimony, these are the members selected by CAI to be deposed in this case. They handpicked these members. Every one of them has had legal matters. All of them have had meaningful access to the courts. They have been able to afford attorneys. They have resources to access the many attorneys with knowledge in this area. So it matters for purposes of our disposition that these services are not available to... I'm not sure what line you're drawing. Hypothetically, we're presented with a scenario suggesting that these are small, money-caught businesses that cannot otherwise afford engaged counsel. Under that hypothetical, what's the difference? And if the difference is the factual one that these services are available to people who can pay a membership fee? I'm not quite sure how your answer is... Let me take a step back, then, if that would be helpful. First of all, this is an as-applied challenge. And in this as-applied challenge, the entities include places like Medical Mutual Insurance Company, which is a huge staff of in-house counsel as one of the many members. These are not mom-and-pop operations that are part of this association. But taking a further look and going deeper, as you suggest, Your Honor, these entities are able to get representation, what the record clearly shows from this case. And moreover, we're not talking about... The original line they're trying to pick from is the button progeny cases. In those cases, what was important is to advance political expressive rights that could not otherwise be pushed or pursued, particularly in the area of civil rights. What about vindicating statutory labor rights and prohibitions? I mean, they say this is the flip side of that from the employer's perspective. And why would we disfavor the employer? Well, I would say one thing, United Mine Workers is legal services... was described as legal services related to workplace issues. It's not nearly that broad. It's very limited to technical Illinois State workers' compensation statutes. And that's what it was focused on, not broad labor services as described. I think it's important to look at what the court itself said in United Transportation Union, which is the case fourth in line to the progeny, the one after United Mine Workers. And in that case, the court looked over all the preceding cases and plainly stated this legal principle. The common thread running through our decisions in NAACP versus Button, Trainment, and United Mine Workers is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. And that's what was needed in that case. And that was the basis of the decision in United Mine Workers. I understand why they highlight United Mine Workers, but it is not in line with that progeny of cases. And of course, the fifth case is Primus, which again goes to no money being collected for the service. And it goes to the fact that certain ACLU matters are going to be required to vindicate civil rights, mostly in that time frame and certainly in that case. And that there's no other access to the courts to have those rights vindicated if you do not allow an organization, public service organization such as that. We have public interest association exception also in North Carolina. I think that was the other exception, Judge Diaz, that would refer to. Again, that talks about it's not for profit. It's a true nonprofit, which CAI, I would suggest, is not. They haven't even decided whether it would be their nonprofit or profit side they would put this business. They would charge a fee, which was not charged in ACLU. And it's not vindicating expressive rights that cannot otherwise get access to the courts, which is, again, as counsel said, there's a plethora of decisions out there on labor law, and there's nothing preventing CAI from serving its members by exercising its First Amendment rights to talk with its members about all these issues. There's no prohibition about that. Duncan, you started when you talked about the enactment was 1931, right? Yes, sir. Yes, Your Honor. I think, put in context, 1931 was quite a different time. You know, people talk about the good old days. I think because you were neither good nor... We were neither old nor good at the time. I mean, for example, in my state of Virginia, we used to have a minimum fee schedule, mandatory. And it was touted as this protects people because we don't want people who are incompetent lawyers and fees have something to do with it. But really, it was to protect the older lawyers. So a new lawyer coming to town couldn't make any money because I've got to pay you the same fee I paid this person. I'm going there. And so we changed. And access to justice, you probably know this, is well documented that we're in a critical time in our country. Access to justice is a big problem in this country. All these lawyers, but it's probably as worse down as it's ever been in modern history. So access is very important. So what's wrong with... You're right, none of these things fits perfectly, but it seems to be very expressive activity to talk about these employers collectively trying to make better policies and regulations for the work environment. We are, Chief Judge Gregory, in fact, in a different time. And I think the point is there have been adaptations made since 1931 of the type that we're talking about, including with public interest groups, to stop that type of issue that you referred to, which I believe was highlighted in the Goldfarb case in the U.S. Supreme Court. But the difficulty, for example, it's quite true that legal services may not charge, but that's because they receive funding from the government. Is that... Or from private citizens who contributed in significant amount. That comes back to, you have here private interests who would be contributing to the provision of services for their members.  It's hard to avoid the conclusion that there's a strong protectionist component underlying this because services are allowed in areas where lawyers are not necessarily financially incentivized to provide those services otherwise. And your distinction, when you talk about membership of CAIs, that here they are. Well, I think there are two points worth making here. One of them is, there are a lot of points worth making. It's an interesting subject, but two points directly to that. One of them is that CAI is a membership of employers, as opposed to the individual rights that need vindicated. It's the subject of the button and it's progeny cases. In those instances, there's an entitlement for representation for individuals. There is no entitlement to representation for corporations. As it happens, their members can afford it. In fact, in order to be a member, we'll have to pay more. Their 2X plan, which is to double their profits and revenues would require more to be paid in order to have this service. And that's in the record, of course. And so there is, in fact, more money that would be paid to have this service. It's a revenue-inducing business approach that's being taken here. And we- The concern thus being that that's more money that's being taken away from attorneys. It cuts them. Wait, there's more money that's being taken out of the pockets of attorneys. Who can charge those fees? Who can otherwise charge those fees? Which brings me to my second point. If this was an antitrust case, I think we'd walk down that road. If this was a Sherman Act case, which the Goldfarb case, of course, was. But this is not in that realm. And what we have, I think, are extremely well-articulated reasons for why this regulation has stood the test of time and why it is a legitimate concern. There's a compelling state interest, and I think Goldfarb also says this, or reaffirms this, while ruling in favor of the plan, that regulation of the professions matters to the states. It's a compelling state interest, and that's what Goldfarb calls it. And there are reasons why having a lawyer report to a non-lawyer, which is what this plan would suggest, violates and puts at risk what the state wants to protect, which is its citizens from practices that potentially would not be in their best interest, and independence and loyalty to the client alone. Mark Merritt, the former president of the State Bar, who was the president at the time of discovering this case, was deposing, if I could, some paid sites, Your Honor. Yeah, but I'm not sure that that proffer withstands great scrutiny, since the individuals that you're concerned about protecting are, in your current scenario, in need of the mantle of the state's protection, but when you described them earlier, they are well-to-do, they're financially advantaged businesses who are capable of obtaining legal services, and thus presumably able to make a judgment about where they wish to obtain them. Right. Well, I mean, our position is that, in this instance, it's not a true, it's not comparable to the mine workers or the button project cases. And I completely, yes, I completely understand that. And so then, trying to take that next step, what is it comparable to, and it runs headlong then into state regulation, but what it's comparable to in that instance would be having lawyers being directed by non-lawyers with an association with 1,200 members who have not shown an inability to afford the services, unlike what happened in the button cases. And it would allow them to then get in a position where they may be representing the very issues that we talked about, the independence, the loyalty, the conflict issues, the confidentiality issues that exist, which are very significant in this context when you have an association over 1,200 members. So those would be the kinds of concerns, and those pages, by the way, are seven, on the joint appendix, are 726 to 30, 734 to 736, 751 to 753, and 763 to 764. I guess, but of course, a decision contrary to your client in this case wouldn't leave it without some ability to regulate, right? Because those issues that you just raised are the kinds of things that could be regulated within a context of allowing the association to do what it wants to do. At the end of the day, of course, the State Bar does what the law tells it to do, and so it would go back and try to figure out the regulations, but I suggest to the court it would not necessarily be in the best interest of the citizens, and there is another way to do this, which is- What citizens? Citizens of the state of North Carolina. But, I mean, citizens, the membership of the sophisticated citizens who are capable of making informed decisions about their best interests? Well, they're in a position to make informed interests about their best interests, but from the position of the integrity of the bar that they present before the court as part of the administration of justice is independent with undisputed loyalty to the interests of their client, and their client alone affects the administration of justice, and that's a legitimate concern. And I should say, and this goes back to a question that Judge Diaz asked earlier, another thing that's available is for prepaid legal services, which is another adaptation, Chief Justice, Chief Judge Gregory, that's been made by the court over the years. When this first came to the court, the, when it first came to the State Bar, it was suggested that you look at prepaid legal services, which was not done. Instead, the legislative course was chosen. That was unsuccessful, so then the lawsuit was filed. Since the lawsuit's been filed, a prepaid legal services plan has been set up. And so, in fact, those members through the prepaid legal services plan can use that service if that is what they desire. It's not that they don't have an option readily available. But there was some pushback from the bar initially. Not on prepaid legal services, the bar suggested it. You suggested it? Yes, when there was conversations with CAI when they first raised the issue, and back in 11 and 13, it was lobbying, 2011 and 13, it was lobbying with the legislature. One of the things the State Bar specifically brought up and discussed was a prepaid legal services plan, which is, my understanding, has been in place since the time this lawsuit started. So, sometime after this lawsuit started. But some of this is sort of trying to make the playing field even for these association of smaller employers or larger ones to be able to have access to good legal representation. I mean, it's a different day. For example, Citizens United. We now, as a corporation, have a right to make campaign contributions. But not a right to legal representation. That's the issue here. But the point, though, is power. Citizens United opens the door in terms of this collective power of corporations. Having access to adequate, competent legal counsel is a matter of power in this country. And when they say that, it's an opportunity to have them to have a chance to collectively express their activities. For example, most Americans who are under 65 years old spend most of their time sleeping or working. Sleeping and working is the number two thing that most Americans under 65 do. That is very expressive in terms of making that experience from a policy standpoint of an employment experience best for everybody. Employees, employers, what's wrong with having an organization that tries to look at these things to improve that experience for most Americans and making it better, and having counsel to direct them and help them? And the lawyer's gonna represent them, and their tweaking is just as questions suggest. I mean, you don't just go and you can do anything. We wanna make sure that you're right to protect citizens, that your lawyer is representing your interest, but I just don't see it. It's almost like in the sense of a solution in search of a problem. Chief Judge Gregory, the prepaid legal services plan gives that option, number one. But number two, there is nothing in this bar regulation which is put in place to meet the state's interests with respect to the independence of the bar. There's nothing in there that prevents CAI from doing any of its expressive activities, which include, as counsel said, lobbying, training, going over manuals, putting on seminars. There is a wide array of expressive matters that they engage in. That has been their core business. That has nothing to do with any regulation of the state bar, and it's not impacted by any regulation of the state bar. The only regulation of the state bar came when they want to expand their business base for purposes of expanding their resources and membership through offering this service. The prepaid legal services option, which has been an adaptation of the regulations through the years to keep up with the times, provides that option to corporations if they want to use it, or they can use their own if they have the ability, as the record shows they have for the ones that have been pointed out, they can go get their own counsel. Yeah, I guess the problem I have with that is you seem to be suggesting that so long as the CAI gets three quarters of its First Amendment load, that's good enough, that they can express themselves three quarters of the time in these other areas with respect to advocacy and the like, but if they attempt to do that in the realm of the practice of law, the bar can stop them. I don't, in that, I don't mean to differ, but I don't agree with the premise of the question. And I think in this case we have to take a step back and look again at what is the relationship and what's being prohibited. The relationship is the bar has regulations, there's no question there's a compelling state interest for the bar to be able to have regulations as set by the legislature. In fact, they don't even have to be the wisest ones under the law, they just have to meet a rational basis test. On the other hand, once we've got those in place, the question is, what's the impact on speech? What does this rule do that impacts speech? The impact of this particular rule is not about speech between the counsel, it's about are you allowed to form that relationship? Is that a related attorney-client fiduciary relationship that can be formed and not otherwise create concern for the lack of independence and the effects that may have on the administration of justice in a legal system in a state? The court may not even agree, although I think there's a lot of compelling support for that notion. The court may or may not agree, but the legislature should have that level of variance to suggest the administration of the courts and for its citizens should be in a place where independence and loyalty is at a premium for counsel. And there have been adjustments made by the state and the state bar that have taken into account circumstances that trouble us, such as the public interest issues, such as paid legal services to be accommodating to this kind of situation. It has not been inflexible about the way it's gone about it and I think that's important. Most recently, the bars had to look at issues related to electronic forms, which have become obviously a significant issue and made adaptations with respect to that through the legislature. So I do think there has to be flexibility, but it needs to maintain sort of the lodestar of what we do, which is to be independent, loyal, confidential in a fiduciary attorney-client relationship. And so the First Amendment strain here, I think is incidental to use the language of the courts as compared to the conduct that's being governed and the compelling interest the state has in setting out that regulation for the conduct. Great, thank you. All right, thank you. I have not said anything about the NIFLA case, and so I won't unless the court has any questions about how it fit in here. Thank you. Thank you. Mr. Field? Thank you. I have seven or eight points. First of all, the thing I didn't say when I first got up here is the evidence that has been ignored by the state and was ignored by the district court, and that is the declarations from those organizations in other states that do exactly what CAI proposes to do with no reported ethical problems. Those declarations appear in the joint appendix of 174 through 175, 182, 184, and 214. That goes to- But isn't the bar correct that the state gets some leeway in this area in determining how, in fact, a fair amount of leeway in this area in determining how best to protect the interests of its citizens? And just my, a large part of your brief seemed to me very much like a plea to the legislature to revisit this issue. Well, we certainly agree with the point that the state has broad powers of regulation, so we don't dispute that. That, we think, is actually important to the protection of the public. Attorneys need to be licensed. They need to be competent. We don't disagree with that. There are ethical rules that follow from that, but- Well, I guess it's just a purely practical matter. I don't ever recall seeing a brief where the summary of arguments started on page 21 because the first 20 pages of your brief were a policy pion to general assembly. Well, we do think it's important for this court to understand what we are trying to do and the way we propose to do it, and if we took too long to do that before we got to the point, I certainly apologize for that. No, you did an observation, not a criticism. Well, in any event, the second point I'd like to make is in response to a question your Honor had. The Dale case says that the transmission of values is an expressive purpose, and we say very clearly in the testimony in this case, it's very clear that the value that we transmit to our members is the importance of complying with state and federal laws in the employer workplace. As to the availability of services, I think there's a vivid quote in the brief from the CEO about a $500 bus ticket is not public transportation, and that really is what our members face when they want to get legal services. If they can't get the answer from CAI, they have to engage a private attorney and start over again with the conversation, and it's an expense, and United Mine Workers and United Transportation don't say that you can only provide these services as an expressive association if you first disprove that there's a need or an unavailability. The fourth point is it was said that we are not an organization of mom and pops. We point to the joint appendix, page 164. 50% of our members have fewer than 100 employees. Most of our members are, in fact, small businesses that have the affordability problem that I just related. The assertion was made that we're not a true nonprofit. I don't know the basis of that. We are a nonprofit organization. That's never been challenged to my knowledge, and the record, I think, is clear. We are a nonprofit association. I think Mr. Duncan sort of ended with a point that I hadn't focused on before, but the question of what lawyers do and whether lawyers are engaged in speech or primarily engaged in conduct, where are you on that? Speech, clearly what is prohibited here is, the conversation between an attorney and a member of the association, whenever in the state's view, the conversation includes an element of legal advice, and that is clearly a regulation on the content of speech. But what about the preparatory work that leads up to that advice, the legal research, the sort of thinking and reading and that kind of stuff? I don't know, and I think that the Supreme Court has sort of struggled in humanitarian law and viscera to figure out where that line between speech and conduct might be. I mean, everything ends up in one way or another being transmitted through speech, whether it's written or verbal. So I think that's a tough line, and that's a tough thing to struggle with. But clearly here, what the state is prohibiting is the speaking of legal advice to members of the association. That's what is prohibited. And that's speech, that's restraint on speech. I'm out of time, thank you. We'll come down, Greek Council, see you to our next meeting.
judges: Roger L. Gregory, Allyson K. Duncan, Albert Diaz